

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| PENNY SCHNEITHORST, | ) | No. ED102017 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 10SL-DR03304-01 |
| | ) | |
| JAMES SCHNEITHORST, JR., | ) | Honorable Kristine Allen Kerr |
| | ) | |
| Appellant. | ) | Filed:  October 27, 2015 |

James Schneithorst, Jr. ("Father") appeals the trial court's judgment modifying his child support and maintenance obligations to Penny Schneithorst ("Mother").  We reverse and remand.

## I.      BACKGROUND

The parties were married in May 1998, and four children were born of the marriage.  By consent of the parties, the trial court entered a judgment dissolving the parties' marriage in March 2011.

### A.      The Dissolution Proceedings and Mother's Motion to Modify

At the time of the dissolution proceedings, Mother was unemployed.  However, Mother's Form 14[1] imputed a gross income to her in the amount of $4,000 per month.

Father was the sole owner of Schneithorst Catering Company ("the family business" or "the business") at the time of the dissolution proceedings.  The family business operates the

---

[1] All references to Form 14 are to the form as set forth in Missouri Supreme Court Rules of Civil Procedure (2015).

Schneithorst restaurant and owns mixed-use retail and office space located on the same premises as the restaurant. Over the course of several years, Father had accumulated 15% of the stock in the family business from gifts of stock from his father James Schneithorst, Sr. ("Mr. Schneithorst"). Father purchased the remaining 85% of the business's stock from Mr. Schneithorst's revocable trust, and the purchase was subject to a loan from Mr. Schneithorst in the amount of $1.35 million, secured by a promissory note. According to the Form 14 Father submitted to the trial court, Father's gross income from the family business was $27,083 per month at the time of the dissolution proceedings.

Under the terms of the dissolution judgment, the parties were awarded joint legal and joint physical custody of the children. In addition, the parties agreed Father would pay Mother $2,500 per month in child support for the children,[2] and the parties agreed Father would pay Mother $7,500 per month in maintenance.

After the dissolution judgment was entered, Mother filed a motion to modify the custody arrangement, increase Father's child support obligation, and reduce Father's maintenance obligation.[3] The issues pertaining to custody were resolved by an agreement of the parties before trial which was memorialized in a parenting plan approved by the trial court. Under the terms of the agreement, Mother was awarded sole legal custody and sole physical custody of the children, and Father was awarded supervised visitation.

---

[2] In the original dissolution case, Father's Form 14 calculated Father's presumed child support amount to be $2,119 per month, and Mother's Form 14 calculated Father's presumed child support amount to be $1,574 per month. Therefore, by the parties agreeing that Father would pay Mother $2,500 per month in child support, the parties agreed to depart upwardly from the Form 14 presumed child support amount.
[3] Because a page is missing from Mother's motion to modify in the record on appeal, it is unclear from the document itself exactly what relief Mother sought with respect to the issues of child support and maintenance. Nevertheless, the trial court's modification judgment and the transcript of the modification proceedings makes it clear that Mother sought an increase in child support and a reduction in maintenance during the modification proceedings.

**B.**     **Evidence Adduced at the Trial on Mother's Motion to Modify**

With respect to the unresolved issues of child support and maintenance, a bench trial was held in March 2014. The following evidence was presented at trial pertaining to Father's involvement in the family business, funds Father received from the business, Father's history of alcohol abuse, financial assistance Father received from his parents, the parties' financial resources and expenses at the time of trial, and the children's expenses at the time of trial.

**1.**     **Father's Involvement in the Family Business, Funds Father Received From the Business, and Father's History of Alcohol Abuse**

The family business paid Father a salary of $60,080 in 2012 and a salary of $26,923 in 2013. From 2012 through the end of September 2013, Father was the sole owner of the family business, and he either directly or indirectly received payments from the business which were sometimes classified as dividends and/or distributions. The payments included checks issued directly to Father from the business's general ledger and payments made to Father's American Express credit card. The payments were not considered ordinary and necessary business expenses but instead were considered advances to Father due to his personal overspending. For example, in 2013, the family business paid expenses charged to Father's American Express credit card including $40,000 in St. Louis Blues hockey tickets, $7,000 in other tickets from Live Nation, and travel expenses to St. Thomas.

In 2012, Father received $220,623 in dividends from the business. In 2013, Father received $92,169 in dividends from the family business, he received $65,239 in other distributions from the business, and the business paid $70,000 in expenses charged to Father's American Express credit card. According to James Huber, a certified public accountant who worked for the family business and Father, the dividends paid to Father or on Father's behalf did not represent profits the family business made in 2012 and 2013; instead, the dividends represented business profits from prior to 2002.

The finances of the family business were affected by Father's overspending on matters which were not considered to be ordinary and necessary business expenses. Although Father had taken $100,000 from an irrevocable life insurance trust and put those funds into the family business in order to help keep the business afloat, the business did not operate at a profit from 2012-2013, and the business was behind in payments to its vendors.

The evidence at trial indicated Father's overspending was tied to Father's problem with alcohol abuse, which began when Father was eighteen years old and resulted in Father going into rehabilitation multiple times. Father's problem with alcohol abuse took place during the course of his marriage to Mother and after the dissolution proceedings. In September 2013, Father went into a rehabilitation facility in Florida for alcohol abuse after an intervention based upon Father "[o]verspending, not maintaining [his] sobriety, [and] not fulfilling [his] obligation to [his] sobriety and [ ] treatment plan." After Father went into rehabilitation in September 2013, Mr. Schneithorst hired a restaurant manager at a salary of $60,000 per year, and Father's fiancé, who began working for the business in May 2013, continued to work for the business.

In October 2013, Mr. Schneithorst exercised a warrant and purchased back Father's 85% of the stock in the family business that Mr. Schneithorst had previously sold to Father, and the transaction resulted in Father owning only 15% of stock in the business. Mr. Schneithorst took that action because Father failed to make payments on the note for the $1.35 million loan Mr. Schneithorst had given to Father to buy those shares, and because Father had been drinking heavily and neglecting the business. The business was in a lot of debt when Mr. Schneithorst took over as the majority shareholder, and Mr. Schneithorst testified[4] he realized leaving Father in control of the family business was a mistake. Mr. Schneithorst also testified he felt he had to

---

[4] All references to Mr. Schneithorst's testimony and Mrs. Schneithorst's testimony are to their deposition testimony.

take over control of the family business in order to protect the business and the Schneithorst family name.

After October 2013 and through the time of the March 2014 trial on Mother's motion to modify, Father continued to own 15% of the stock in the family business, but Father had no power over or direct involvement in the family business, and there were no plans for Father to be involved in the operations of the family business in the future. Mr. Schneithorst, who controlled and "ran" the business since October 2013, testified he was not going to make Father a part of the company in the future and had no plans to hire Father as an active employee.

Nevertheless, Father remained an employee of the business for "insurance purposes" only, and the business paid for Father's and the parties' children's medical and dental insurance, with the cost of insurance for the children totaling $675 per month. As of the date of trial, Father's fiancé used a stamp bearing Father's name to write payroll checks for the family business, and Father remained the registered agent for the business.

### 2. Financial Assistance Father Received from His Parents and Father's Financial Resources and Expenses at the Time of Trial

Between the time of the dissolution judgment and the trial on Mother's motion to modify, Father's parents provided financial assistance to Father by paying: (1) approximately $76,600 for Father's alcohol rehabilitation treatment; (2) approximately $140,000 for Father's attorney's fees; (3) $100,000 to $200,000 for improvements to Father's home; and (4) five $2,500 payments for Father's monthly child support obligation to Mother.

By the time of the trial on Mother's motion to modify, trust funds Father had previously used to pay his mortgage, child support, and maintenance payments had been exhausted. In addition, Father owned 15% of the stock in the family business at the time of the trial, as he did beginning in October 2013. However, this Court can find no evidence in the record indicating

5

Father received or would receive any financial resources as a result of owning 15% of the stock in the family business.

Father did not testify at the trial on Mother's motion to modify because he returned to rehabilitation for alcohol abuse approximately one week prior to trial. However, Father's deposition, which was taken a few weeks before trial, was admitted into evidence.

No testimony was adduced regarding any current employment for Father, and Mr. Schneithorst testified Father was not receiving any income from the family business. However, a vocational expert evaluated Father's employment options and determined Father could earn between $30,187 and $63,270 per year in a variety of jobs.

According to Father's first amended statement of income and expenses, Father had $0 in monthly gross income and Father's total average monthly expenses were approximately $7,992. Father's fiancé testified at trial that she had been making payments on Father's car while he was in rehabilitation and her name was on the loan for the car. Father's fiancé also testified she was going to return the car to the lender and stop making payments on the loan.

In large part because Father was in rehabilitation at the time of trial, there was scant evidence regarding his future living arrangements. Father's house was in foreclosure because he had failed to make payments on the house since July 2013, and there were no plans as to where Father was going to live after he was finished with rehabilitation. Mr. Schneithorst and his wife Mrs. Caro Schneithorst ("Mrs. Schneithorst") testified that after rehabilitation Father could potentially live in their extra home in St. Louis which was for sale,[5] if the house was not sold. Mr. and Mrs. Schneithorst also testified they would continue to pay the mortgage on their extra St. Louis home if Father ended up living there.

---

[5] Mr. and Mrs. Schneithorst owned a home in Florida where they resided for part of each year, a home in Creve Coeur, Missouri where they resided for the other part of the year, and another extra home in the St. Louis area which was for sale.

6

**3.    Mother's Financial Resources and Her and the Children's Expenses at the Time of Trial**

As of the time of the trial on Mother's motion to modify, Mother was working approximately twenty hours a week as an occupational therapist. According to Mother's third amended statement of income and expenses, her monthly gross income was $2,147, and Mother's total average monthly expenses for her and the children were approximately $12,700.

**C.    The Trial Court's Modification Judgment**

On July 25, 2014, the trial court entered its initial modification judgment, and the trial court entered an amended modification judgment on September 4, 2014. The trial court's modification judgment[6] increased Father's child support obligation to $5,000 per month regardless of the number of children entitled to support and decreased Father's maintenance obligation to $1,500 per month. In making this determination, the trial court found "the needs of [Mother] and the children, standing alone, have not substantially changed since the time of the parties' dissolution and, on their face, do not constitute a substantial and continuing change of circumstances."[7] Instead, the court found the substantial and continuing change in circumstances which made the previous awards of child support and maintenance unreasonable were: (1) Mr. Schneithorst's actions of repurchasing Father's 85% of the stock in the family business and "effectively taking back control of the family business" in October 2013; (2) "the removal of [Father] from control of the family business"; and (3) Father no longer having unrestricted access to the revenue stream of the family business to satisfy his family's needs.

The trial court prepared its own Form 14 which imputed a monthly gross income to Father in the amount of $5,083 ($60,996 a year), finding Father could reasonably earn that salary

---

[6] All references to the trial court's modification judgment encompass all effective provisions of the initial and amended modification judgment.

[7] In fact, the court explicitly found that the "reasonable monthly household expenses for [Mother] and her four children [were] $10,000 per month," which was "the [same] amount[ ] [of expenses] which the parties agreed upon and the court approved in the[ ] [parties'] original dissolution decree." The court also found that Mother's own reasonable needs were $1,500 per month.

7

going forward based upon his education and experience. The trial court's Form 14 also found

Mother's monthly gross income was $2,500 ($30,000 a year). In performing its Form 14

calculation, the trial court did not enter an amount for Mother under Line 1a for "[m]onthly

court-ordered maintenance being received" and did not enter an amount for Father under Line 2b

for "[m]onthly court-ordered maintenance being paid," even though the trial court's modification

judgment ordered Father to pay Mother $1,500 per month in maintenance. The trial court's

prepared Form 14 calculated Father's presumed child support to be $1,514 per month for the

parties' four children.

However, the trial court found Father's presumed child support obligation was unjust and

inappropriate because it "does not come close to meeting the children's needs, nor is it reflective

of the true resources which [Father] (as a 15% shareholder of [the family business]) has

historically had access to." The trial court found an appropriate amount to allocate for child

support was $5,000 per month, regardless of how many children were entitled to support,

"bas[ing] this child support number on its assessment of [Father's] reasonable abilities to become

employed in the future and on its assessment of [Father's] access to the financial assets of [the

family business], in order to meet his child support obligations into the future." In addition, the

trial court found Father's minimum reasonable expenses were $1,500 per month.[8]

The trial court's modification judgment contains several findings, including some of

those previously mentioned, indicating that the trial court's decision to modify Father's child

support and maintenance obligations was largely based on the trial court's determination of

Father's financial resources.[9] On the one hand, the trial court found Father no longer controlled

the family business, found Father would no longer have unrestricted access to the revenue stream

of the family business, and found Father was not welcome back into the business as anything

---

[8] The trial court's specific findings regarding this determination are discussed below in Section II.C.1.
[9] Additional findings are discussed below in Section II.B.2.

more than a 15% shareholder. On the other hand, the trial court found the history of Father receiving funds from the family business and the history of Father receiving financial assistance from his parents should be considered as part of Father's financial resources for purposes of modifying his child support and maintenance obligations. Father appeals the trial court's modification judgment.

## II.    DISCUSSION

Father raises three points on appeal alleging the trial court erred in modifying Father's child support and maintenance obligations. Father's first point on appeal and subpart one of his second point on appeal[10] assert the trial court erred in finding that Father's financial resources to pay child support and maintenance obligations included funds from the family business and financial assistance from his parents. Subpart two of Father's second point on appeal asserts the trial court erred in its determination of Father's reasonable expenses. Subpart one of Father's third point on appeal asserts the trial court erroneously calculated his Form 14 presumed child support obligation because the court did not include Father's maintenance obligation in its calculation. Finally, subpart two of Father's third point on appeal contends the trial court erred in ordering Father to pay Mother a gross amount of monthly child support regardless of the number of the children entitled to support instead of ordering support incrementally.

### A.    Standard of Review

As with any court-tried case, we review a trial court's judgment modifying a dissolution decree pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Mehler v. Martin*, 440 S.W.3d 529, 531 (Mo. App. E.D. 2014). Accordingly, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the

---

[10] This Court's reference to various subparts of Father's points on appeal does not necessarily reflect the order of Father's various arguments within a single point on appeal but instead is used by this Court for organizational purposes.

9

evidence, or it erroneously declares or applies the law. *Id.* In determining whether a trial court's judgment is supported by substantial evidence, an appellate court views the evidence in the light most favorable to the judgment, disregards all contrary evidence, and defers to the trial court's credibility determinations. *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014). "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Id.* at 199. Evidence is considered to have probative force when it has a tendency to make a material fact more or less likely. *Id.* A trial court's judgment is not supported by substantial evidence if it is based on speculation. *Friedman v. Friedman*, 965 S.W.2d 319, 325 (Mo. App. E.D. 1998); *M.A.Z. v. F.J.Z.*, 943 S.W.2d 781, 790 (Mo. App. E.D. 1997).

**B.     Whether the Trial Court Erred in Finding Father's Financial Resources Included Funds from the Family Business and Financial Assistance from His Parents**

Father's first point on appeal and subpart one of his second point on appeal contend the trial court erred in modifying his child support and maintenance obligations. Specifically, Father asserts the trial court's finding that his financial resources to pay those obligations included funds from the family business and financial assistance from his parents was not supported by substantial evidence.

**1.     General Law**

"[T]he provisions of any judgment respecting maintenance or support may be modified only upon a showing of changed circumstances so substantial and continuing as to make the terms [of the original award] unreasonable." Section 452.370.1 RSMo 2000.[11] Changed circumstances sufficient to support modification of maintenance or child support must, *inter alia*,

---

[11] We note that section 452.370 was amended effective August 28, 2014, but that amendment does not apply to this case because it was effective after the modification proceedings. Therefore, all references to section 452.370 are to RSMo 2000.

be proven by detailed evidence and must be supported by substantial evidence. *In re Marriage of Lindhorst*, 347 S.W.3d 474, 476 (Mo. banc 2011); *Mehler*, 440 S.W.3d at 531.

Section 452.370.1 provides in relevant part:

> . . . In a proceeding for modification of any child support or maintenance judgment, the court, in determining whether or not a substantial change in circumstances has occurred, shall consider *all financial resources of both parties*, including the extent to which the reasonable expenses of either party are, or should be, shared by a spouse or other person with whom he or she cohabits, and the earning capacity of a party who is not employed.

(emphasis added). "[A]ll financial resources of both parties" has been interpreted broadly by Missouri Courts, and the language encompasses not just a parent's earnings for services rendered but rather all resources available to a parent. *See Thurman v. Thurman*, 95 S.W.3d 172, 175 (Mo. App. W.D. 2003); *Margolin v. Margolin*, 796 S.W.2d 38, 44 (Mo. App. W.D. 1990). Accordingly, no financial resource available to a parent is exempt from the trial court's consideration for purposes of determining child support and maintenance, including financial gifts to the parent from a third party. *Thurman*, 95 S.W.3d at 175-76; *In re Marriage of Petersen*, 22 S.W.3d 760, 764-65 (Mo. App. S.D. 2000); *Margolin*, 796 S.W.2d at 44.

## 2.      The Trial Court's Findings

The trial court made several findings indicating that the trial court's decision to modify Father's child support and maintenance obligations was largely based on the trial court's determination of Father's financial resources. On the one hand, the trial court found Father no longer controlled the family business, Father would no longer have unrestricted access to the revenue stream of the family business, and Father was not welcome back into the business as anything more than a 15% shareholder. The trial court specifically found the substantial and continuing change in circumstances which made the previous awards of child support and maintenance unreasonable were: (1) Mr. Schneithorst's actions of repurchasing Father's 85% of the stock in the family business and "effectively taking back control of the family business" in

11

October 2013; (2) "the removal of [Father] from control of the family business"; and (3) Father no longer having unrestricted access to the revenue stream of the family business to satisfy his family's needs. The court found "it would be unreasonable to assume that Mr. Schneithorst would permit [Father] to return to his former full ownership of the [business] or grant him unrestricted access to all of [the business's] revenue stream, due to [Father's] previous reckless management of [the business] . . .." In addition, the court explicitly found credible testimony from the family business's attorney that Father was not welcome back into the business as anything more than a 15% shareholder.

On the other hand, the trial court found the history of Father receiving funds from the family business and financial assistance from his parents should be considered as part of Father's financial resources for purposes of modifying his child support and maintenance obligations. The trial court specifically found the Form 14 presumed child support amount of $1,514 per month was unjust and inappropriate in part because that amount was not "reflective of the true resources which [Father] (as a 15% shareholder of [the family business]) has historically had access to." The trial court then ordered Father to pay Mother $5,000 per month in child support, based in part on the court's "assessment of [Father's] access to the financial assets of [the family business], in order to meet his child support obligations into the future." The trial court found Father had access to financial resources of the family business because as of the date of trial Father was a 15% shareholder in the business, because the business had previously allowed Father to withdraw cash from the business, and because the business had previously paid hundreds of thousands of dollars towards expenses Father incurred on his American Express card. The court also found it "does not assume . . . that [Father's] family and [the family business] would leave [Father] to fend for himself in the future, with no source of support or

12

diversion of assets to him" because "history supports the opposite conclusion."  The trial court

specifically found:

> [T]he [family business] generates considerable revenue and [ ] [Father] was able
> to take advantage of this revenue stream (via being paid 'dividends to
> shareholder') since 2002, when he took over the operations of [the business] and
> was his family's sole support for their luxurious lifestyle for eleven years . . ..
> [Father] is a 15% shareholder and family member of an apparently lucrative
> business, whose revenues have (historically) lavishly supported [Father's] family
> since 2002, and still supply financial support to his parents, who live six months
> per year in Florida.  The court finds that [Father] will have some access to [the
> family business's] resources in the future, as his family has supported him during
> treatment this year (paying over $76,000 for this benefit) . . ..

### 3.    Funds Father Received from the Family Business

For the reasons discussed below, we find the trial court erred in finding the history of

Father receiving funds from the family business should be considered as part of Father's

financial resources for purposes of modifying his child support and maintenance obligations.

In this case, there was an abundance of evidence that in 2012 and 2013, when Father was

the sole owner of the business, he directly or indirectly received hundreds of thousands of dollars

in funds from the family business in the form of dividends and/or distributions.  The payments

were not considered ordinary and necessary business expenses but instead were considered

advances to Father due to his personal overspending which was tied to Father's problem with

alcohol abuse.  In addition, the dividends paid to Father or on Father's behalf did not represent

profits the family business made in 2012 and 2013; instead, the dividends represented business

profits from prior to 2002.

The finances of the family business were affected by Father's overspending on matters

which were not considered to be ordinary and necessary business expenses.  The business did not

operate at a profit from 2012-2013, and the business was behind in payments to its vendors.  In

part because Father had been drinking heavily and neglecting the family business, in October

2013 Mr. Schneithorst exercised a warrant and purchased back Father's 85% of the stock in the

13

family business that Mr. Schneithorst had previously sold to Father, and the transaction resulted in Father owning only 15% of stock in the business.

Although Father continued to own 15% of the stock in the family business through the time of the trial, this Court can find no evidence in the record indicating Father received or would receive any financial resources as a result of owning 15% of the stock in the family business. In addition, after October 2013 and through the time of the March 2014 trial on Mother's motion to modify, Father had no power over or direct involvement in the family business,[12] and there were no plans for Father to be involved in the operations of the family business in the future. Mr. Schneithorst, who controlled and "ran" the business since October 2013, testified he was not going to make Father a part of the company in the future and had no plans to hire Father as an active employee. In addition, Mr. Schneithorst testified Father was not receiving any income from the family business.

In sum, there is no substantial evidence in the record indicating Father accessed or directly received any funds from the family business after October 2013, and there is no substantial evidence in the record indicating Father would access or directly receive funds from the family business in the future. Accordingly, we hold the trial court's determination that Father's financial resources included funds from the business was based upon speculation rather than substantial evidence. *See Friedman*, 965 S.W.2d at 325; *M.A.Z.*, 943 S.W.2d at 790.

---

[12] At the time of trial, the only evidence of Father's association with the family business was that: (1) he was an employee of the business for "insurance purposes" only, and the business paid Father's and the parties' children's medical and dental insurance, with the cost of insurance for the children totaling $675 per month; (2) Father's fiancé used a stamp bearing Father's name to write payroll checks for the family business; and (3) Father remained the registered agent for the business. We find this evidence is not relevant to our determination in this case because it was not relied upon by the trial court in its conclusion that the history of Father receiving funds from the family business should be considered as part of Father's financial resources for purposes of modifying his child support and maintenance obligations; instead, the trial court's focus was on Father's status as a 15% shareholder, Father's previous actions of withdrawing cash from the business, and the business previously paying hundreds of thousands of dollars towards expenses Father incurred on his American Express card. Moreover, there was no evidence presented that Father's stamped signature on checks, Father's handwritten signature on checks, or Father's status as a registered agent was used to provide funds to Father.

14

**4.      Financial Assistance Father Received from His Parents**

As previously stated, no financial resource available to a parent is exempt from the trial court's consideration for purposes of determining child support and maintenance, including financial gifts to the parent from a third party. *Thurman*, 95 S.W.3d at 175-76; *Petersen*, 22 S.W.3d at 764-65; *Margolin*, 796 S.W.2d at 44. The cases of *Thurman* and *Petersen* are instructive as to when it is proper for a trial court to consider financial gifts to a parent from a third party as a component of the parent's financial resources for purposes of determining child support and maintenance. In *Thurman*, the Western District held the trial court did not err in considering a substantial lump-sum inheritance a father received from a third party as a financial resource available to father in determining whether there was a change of circumstances warranting a modification of his child support obligation. 95 S.W.3d at 174, 175-76 ($160,000 lump-sum inheritance).

In addition, in *Petersen*, the Southern District held the trial court did not err in considering recurring monthly gifts a mother received from her parents in determining a child support obligation where the parents deposited an average of $2,000 a month for seventeen months in mother's checking account for the children to attend school, for food, and for attorney's fees. 22 S.W.3d at 764-65. In *Petersen*, the mother's father testified he and his wife were "helping [their daughter] and the children" and that he intended to continue "as long as he is working and able to do so." *Id*. at 764. The Southern District found:

> In this instance, the financial assistance from [Mother's] parents has been a regularly occurring event, marked by a check being deposited into her checking account at the end of each month. The established pattern of financial assistance, in this case, is sufficient to support the judgment. We can envision other instances where the assistance has not been regular, and the future of payments dubious, where it would be inappropriate to include similar gifts in a parent's income.

*Id*. at 765.

15

Here, between the time of the dissolution judgment and the trial on Mother's motion to modify, Father's parents provided financial assistance to Father by paying: (1) approximately $76,600 for Father's alcohol rehabilitation treatment; (2) approximately $140,000 for Father's attorney's fees; (3) $100,000 to $200,000 for improvements to Father's home; and (4) five $2,500 payments for Father's monthly child support obligation to Mother. To the extent Father's parents' payments for Father's alcohol rehabilitation treatment, Father's attorney's fees, and improvements to Father's home are lump-sum financial gifts constituting substantial sums of money, in that respect they are like the substantial lump-sum inheritance received by the father in *Thurman*. *See* 95 S.W.2d at 174. However, that is where the similarity ends. Unlike the lump-sum inheritance given directly to the father in *Thurman*, to which he had direct access and in which he had control over how the funds were spent, there is nothing in the record indicating the financial assistance given by Father's parents was ever given directly to Father or that it was within his control as to how the funds were spent. Accordingly, we find the trial court erred in considering Father's parents' lump-sum financial gifts as part of Father's financial resources for purposes of modifying his child support and modification obligations.

With respect to Father's parents' recurring financial assistance for child support, the record reflects five $2,500 payments for Father's monthly child support obligation to Mother were made by Father's parents between November 15, 2013 and March 1, 2014. Similar to the lump-sum financial gifts from Father's parents discussed in the preceding paragraph, there is nothing in the record indicating the child support payments were ever given directly to Father or that it was within his control as to how the funds were spent. Accordingly, this case can be distinguished from the facts of *Petersen*, where the financial assistance the mother received from her parents was a regularly occurring event over the course of seventeen months, marked by a check being deposited into her checking account at the end of each month. *See* 22 S.W.3d at

16

764-65.  In addition, unlike in *Petersen*, where mother's father testified he intended to continue providing the recurring financial assistance to mother "as long as he is working and able to do so," *see id*. at 764, in this case there is not substantial evidence to support a finding that Father's parents planned to continue to pay a specific amount of Father's child support obligation in the future – whether the obligation remained $2,500 per month or was modified.

Instead, Mr. and Mrs. Schneithorst both testified they had financial problems.  In addition, when Mrs. Schneithorst was asked by counsel, "[I]f [Father] is successful [with his rehabilitation], would you help him meet his financial obligations after this is over with?" Mrs. Schneithorst responded, "I don't know if I could."  Moreover, when Mr. Schneithorst was asked by counsel, "[I]f [Father] does not complete his rehab, do you have any plans or do your wife and you have any plans on how to assist [Mother] in caring for the children?" Mr. Schneithorst responded "No."

Based on the foregoing, we find Father's parents' five payments of $2,500 for Father's monthly child support obligation was not an established pattern of financial assistance and the future of the payments was dubious and speculative.  In addition, to the extent the trial court's determination that Father's financial resources included financial assistance from his parents in the future, this finding was based on speculation rather than substantial evidence.  *See Friedman*, 965 S.W.2d at 325; *M.A.Z.*, 943 S.W.2d at 790.  Therefore, the trial court erred in considering Father's parents' financial assistance as part of Father's financial resources for purposes of modifying his child support and modification obligations.  *See Petersen*, 22 S.W.3d at 765 (indicating it would be inappropriate to include financial gifts as part of a parent's financial resources under similar circumstances).

17

**5. Conclusion**

Because the trial court erred in finding Father's financial resources included funds from the family business and financial assistance from his parents, the trial court's judgment modifying Father's child support and maintenance obligations is reversed and remanded for further proceedings in accordance with this opinion. *See Schuchard v. Schuchard*, 292 S.W.3d 498, 500-01 (Mo. App. E.D. 2009) (reversing and remanding a trial court's modification judgment where the court erred in its consideration of funds in determining a party's financial resources). Point one and subpart one of point two on appeal are granted.

**C. Issues Which Might Arise on Remand**

The remainder of Father's points on appeal are related to the trial court's modification of his child support and maintenance obligations. Because we have reversed and remanded those provisions of the trial court's judgment, Father's remaining points may be moot. Nevertheless, we will address those points to the extent they involve issues which might arise on remand. *See Morgan v. Ackerman*, 964 S.W.2d 865, 869 (Mo. App. E.D. 1998) (addressing an appellant-father's points under similar circumstances).

**1. Whether the Trial Court Erred in its Determination of Father's Reasonable Expenses**

In subpart two of Father's second point on appeal, he argues the trial court erred in its determination of Father's reasonable expenses.

The trial court found in relevant part:

> [T]here is very little reliable evidence before [the court] as to what [Father's] reasonable needs might be in the future. At the time of trial, [Father] was living at the rehab facility in Florida, with an uncertain length of stay . . .. The Court finds it would be reasonable for [Father] to live in one of the homes owned by his parents, in their home in St. Louis, or in their home in Florida (where he was in treatment). Accordingly, the court considers the resources of [Father's] parents as 'shared' expenses pursuant to section 452.370.1 RSMo. The court finds that [Father's] living expenses would be greatly reduced from those which he provided to the court in his Statement of Income and Expenses . . .. The court

18

finds that [Father's] house was in foreclosure status and that the family intended to let this asset go; thus, [Father] has no mortgage, insurance or tax payments to make in the future. His cable, internet, gas water, electricity, trash, sewer and television payments are already being paid by the homeowners (his parents). The court finds that [Father] has no automobile expenses . . .. After adjusting his expenses, the court finds that [Father's] minimum reasonable expenses will be $1,500 per month.

Father claims the trial court erred in considering "the resources of [Father's] parents as 'shared' expenses pursuant to section 452.370.1 [ ]" in its determination of Father's reasonable expenses because there was no evidence Father was cohabitating with his parents at the time of trial and it was speculative he would be living with them in the future.

As previously stated, section 452.370.1 provides in relevant part that:

. . . In a proceeding for modification of any child support or maintenance judgment, the court, in determining whether or not a substantial change in circumstances has occurred, shall consider all financial resources of both parties, *including* the extent to which the reasonable expenses of either party are, or should be, shared by a spouse or other person with whom he or she cohabits, and the earning capacity of a party who is not employed.

(emphasis added). The use of the term "including" in a statute "has almost universally been construed by Missouri [C]ourts as a term of enlargement, as providing an illustrative, non-exclusive, example, or as both." *Short v. Southern Union Co.*, 372 S.W.3d 520, 532 (Mo. App. W.D. 2012). Accordingly, the language of section 452.370.1 "does not *limit* the subjects which the court may consider; the court is not confined to those subjects which are expressly mentioned in section 452.370 but obviously may consider a wide range of circumstances which bear on the amount of child support [and maintenance to award]." *Loetel v. Loetel*, 706 S.W.2d 235, 236 (Mo. App. W.D. 1986) (emphasis in original). Therefore, consistent with our discussion in Sections II.B.1. and II.B.4. with respect to how a court's consideration of "all financial resources of both parties" may include financial gifts to the parent from a third party, we decline to interpret section 452.370.1 to mean a court can consider expenses shared or paid by another person only when that person is cohabitating with the party to the modification proceeding.

19

Accordingly, the trial court did not err in considering the resources of Father's parents as shared expenses under section 452.370.1 merely because it was undisputed Father was not cohabitating with his parents at the time of trial.

Nevertheless, for the reasons discussed below, we conclude the trial court's finding that Father's parents would be contributing to Father's expenses was based on speculation rather than substantial evidence. *See Friedman*, 965 S.W.2d at 325; *M.A.Z.*, 943 S.W.2d at 790. While it was true that Father's parents had paid for Father's stay in the rehabilitation facility in Florida, the trial court's conclusion that Father's parents would be contributing to Father's expenses was based on the trial court's finding that it would be reasonable for Father to be living in one of his parents' homes.

As an initial note, this Court can find no evidence in the record indicating Father's parents were possibly willing to let Father live in their home in Florida during or after Father's rehabilitation. Accordingly, to the extent the trial court found it would be reasonable for Father to live at his parents' home in Florida, this finding was not supported by substantial evidence.

In large part because Father was in rehabilitation at the time of trial, there was scant evidence regarding his future living arrangements. The evidence at trial demonstrated Father's house was in foreclosure because he had failed to make payments on the house since July 2013, and there were no plans as to where Father was going to live after he was finished with rehabilitation. In addition, Mr. and Mrs. Schneithorst testified that after rehabilitation Father could potentially live in their extra home in St. Louis which was for sale, *if* the house was not sold. Mr. and Mrs. Schneithorst also testified they would continue to pay the mortgage on their extra St. Louis home *if* Father ended up living there. Consequently, the possibility that Father would eventually live at his parents' extra St. Louis home and that Father's parents would pay Father's mortgage and any other related expenses was contingent upon: (1) Father no longer

20

being in the rehabilitation facility; and (2) Father's parents' extra St. Louis home not being sold. Because of the unknown status of those two contingencies, we find the trial court's conclusion that Father's parents would be contributing to Father's expenses and the trial court's finding that it would be reasonable for Father to be living in one of his parents' homes was based on speculation rather than substantial evidence. *See Friedman*, 965 S.W.2d at 325; *M.A.Z.*, 943 S.W.2d at 790.

For purposes of this appeal, it is unnecessary for us to discuss the details of the trial court's determination of Father's reasonable expenses any further, including whether the trial court's finding that his reasonable monthly expenses were $1,500 was supported by substantial evidence. On remand, both parties will have the opportunity to submit evidence of Father's reasonable expenses and evidence of "all financial resources" of both parties. Section 452.370.1. Finally, based on the evidence presented on remand, the trial court shall make a determination of the amount of Father's reasonable expenses which is consistent with the language of section 452.370.1 and this opinion. Subpart two of point two denied in part and granted in part.

### 2. Whether the Trial Court Erroneously Calculated Father's Form 14 Presumed Child Support Calculation

In subpart one of Father's third point on appeal, he asserts the trial court erroneously calculated his Form 14 presumed child support obligation because the court did not include Father's maintenance obligation in its calculation. Mother concedes this point of error.

In determining the amount of child support to award a party, courts must apply a two-step analysis. *Sullins v. Sullins*, 417 S.W.3d 878, 881 (Mo. App. E.D. 2014). First, the trial court is required to calculate the presumed child support amount pursuant to Form 14, either by accepting one of the party's Form 14 calculations or by performing its own Form 14 calculation. *Id*. "The first step is a mathematical calculation, the mandatory use of which insures that the child support guidelines will be considered in every case." *Id*. (quotations omitted). Under the

21

second step, the trial court considers whether the presumed child support amount is "unjust or inappropriate" after considering all relevant factors. *Id*. "Although the presumed child support amount may be rebutted upon a finding that it is unjust or inappropriate after consideration of all relevant factors without a mandatory worksheet or formula, the first step of calculating the presumed amount using Form 14 is mandatory." *Id.* at 882.

The Directions for Form 14, Line 1a instruct a court to "[e]nter the monthly amount of any court order for maintenance to the extent of the amounts actually being received toward current maintenance." In addition, the Directions for Form 14, Line 2b instruct a court to "[e]nter the monthly amount of any court order for maintenance to the extent of the amounts actually being paid toward current maintenance." Finally, Comment A to the Directions for Form 14, Lines 1a and 2b provides:

> If the court is establishing both child support and maintenance, the court *shall* first determine the appropriate amount of maintenance. This amount *shall* be included as an addition to the gross income (line 1a) of the parent receiving the maintenance and as a reduction in the gross income (line 2b) of the parent paying the maintenance.

(emphasis added). A trial court misapplies the law when it "[does] not follow the directions set out for completion of the Form 14 [and] . . . '[does] not make any provisions in its Form 14 calculation for maintenance'." *Souci v. Souci*, 284 S.W.3d 749, 754 (Mo. App. S.D. 2009) (quoting *Adams v. Adams*, 108 S.W.3d 821, 829 (Mo. App. W.D. 2003)).

Here, the trial court prepared its own Form 14 which calculated Father's presumed child support obligation to be $1,514 per month for the parties' four children, and then the court found that amount was unjust or inappropriate. In performing its own Form 14 calculation under the first step, the trial court did not enter an amount for Mother under Line 1a for "[m]onthly court-ordered maintenance being received" and did not enter an amount for Father under Line 2b for "[m]onthly court-ordered maintenance being paid," even though the trial court's modification

22

judgment ordered Father to pay Mother $1,500 per month in maintenance. The parties agree the trial court erred in failing to enter an amount under Lines 1a and 2b of Form 14. *See Souci*, 284 S.W.3d at 754; *Adams*, 108 S.W.3d at 829.

On remand, after the trial court has entered new findings on maintenance, it shall determine the amount of child support to award by applying the two-step process set forth above. Comment A to the Directions for Form 14, Lines 1a and 2b; *Sullins*, 417 S.W.3d at 881-82. In calculating the presumed child support amount pursuant to Form 14 in the first step of the process, the Form 14 used by the court shall reflect any maintenance which is awarded to Mother in Lines 1a and 2b. *Sullins*, 417 S.W.3d at 881; *Souci*, 284 S.W.3d at 754; *Adams*, 108 S.W.3d at 829. Subpart one to point three granted.

3. **Whether the Trial Court Erred in Ordering Father to Pay Mother a Gross Amount of Monthly Child Support**

In subpart two of Father's third point on appeal, which is his final argument on appeal, Father contends the trial court erred in ordering Father to pay Mother a gross amount of monthly child support ($5,000) regardless of the number of the children entitled to support instead of ordering support incrementally. For the reasons discussed below, we disagree.

It is not erroneous for a trial court to award a gross amount of child support. *Racherbaumer v. Racherbaumer*, 844 S.W.2d 502, 503, 505 (Mo. App. E.D. 1992). While Comment B to the Directions for Form 14, Line 12 ("Comment B to Line 12") does allow for incremental child support awards, such an award is not mandatory. *See Ricklefs v. Ricklefs*, 111 S.W.3d 541, 546 (Mo. App. W.D. 2003) (discussing a former, similar version of Comment B to Line 12). Instead, Comment B to Line 12 states in relevant part, ". . . when awarding support for more than one child, a court['s] . . . order shall be in a gross amount *or* ordered incrementally" (emphasis added). Accordingly, it is permissible for a trial court to award a gross amount of child support or to order an incremental award. Regardless of which method the trial court

chooses to utilize on remand, the trial court's decision must be supported by substantial evidence, must not be against the weight of the evidence, and must not erroneously declare or apply the law. *Mehler*, 440 S.W.3d at 531. Subpart two to point three denied.

### III. CONCLUSION

The trial court's judgment modifying Father's child support and maintenance obligations to Mother is reversed and remanded for proceedings in accordance with this opinion.


_____
ROBERT M. CLAYTON III, Judge

Patricia L. Cohen, P.J., and
Roy L. Richter, J., concur.